UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: THE APPLICATION OF NATHAN ) | |
| WILLIAM LUEDTKE, ) | |
| ) | |
| Petitioner, ) | |
| ) | Cause No. 1:12-cv-750-WTL-TAB |
| vs. ) | |
| ) | |
| HEIDI WYN LUEDTKE-THOMSEN, ) | |
| ) | |
| Respondent. ) | |

**ENTRY REGARDING PETITION FOR RETURN OF CHILDREN**

Before the Court is Petitioner Nathan Luedtke's Petition for Return of Children (dkt. #1). The Court held a hearing regarding the petition on June 27, 2012, during which time the parties presented evidence and the Court heard argument. Being duly advised, the Court now **GRANTS** the Petitioner's Petition for the reasons and to the extent set forth below.

**I. STANDARD**

Mr. Luedtke brings this petition pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et seq.*, which implements the Hague Convention on the Civil Aspects of International Child Abduction. Hague Conference on Private International Law: Hague Convention on the Civil Aspects of International Child Abduction, Nov. 24, 1980, 19 I.L.M. 1501 (1980) ("Hague Convention"). Pursuant to ICARA, a person whose child has been removed from his custody in a signatory country to the United States may petition in federal or state court for the return of the child. 42 U.S.C. § 11603(a), (b). However, courts entertaining such petitions must refrain from determining the merits of underlying child custody claims, 42 U.S.C. § 11601(b)(4); rather, the purpose of these proceedings is to return the parties to the status quo, thereby depriving the abductor's actions of any practical or jurisdictional

consequences and returning the parties to the forum where the most relevant evidence exists. *See Koch v. Koch*, 450 F.3d 703, 711-712 (7th Cir. 2006) (citing the report of Elisa Perez-Vera, the official Hague Conference reporter).

The Federal Rules of Evidence apply during petition hearings, *see* Fed. R. Evid. 1101(b); *Karkkainen v. Kovalchuck*, 445 F.3d 280, 289 (3d Cir. 2006) (concluding that the district court "admitted hearsay testimony only under the exceptions of the Federal Rules and properly limited its use"), with the exception that authentication of documents is not required. 42 U.S.C. § 11605. Finally, an order granting or denying a petition must be supported by findings of fact on key issues. *Khan v. Fatima*, 680 F.3d 781, 788 (7th Cir. 2012).

## II. **FINDINGS OF FACT**

Petitioner Nathan Luedtke and Respondent Heidi Luedtke-Thomsen were married in 2006. Nathan, who was born in Naperville, Illinois, met Heidi, who was born in California, in California, and the couple lived together there while Nathan was a graduate student at the University of California, San Diego. The couple then moved to New Haven, Connecticut, where Nathan completed a two year post-doctoral fellowship. For the past six years the couple has lived in Switzerland, where Nathan works as a professor of organic chemistry at the University of Zurich. Heidi is the primary caretaker of the couple's two children – a four-and-a-half year-old girl and a fifteen month-old boy – both of whom were born in Switzerland. Although Nathan works for approximately ten hours per day, he also participated in caring for the children on evenings and weekends.

Heidi recently convinced Nathan to relocate from the apartment where they had lived for the past four years to a larger flat. Nathan testified that they signed a one-year lease for this new

apartment, and he believes that Heidi herself signed the lease. Nathan was recently awarded a tenured professorship at the University of Zurich, and he testified that he did not foresee leaving Switzerland in the future.

On March 26, 2012, Nathan arrived at the couple's apartment to find his wife and children absent without any indication of their whereabouts. He soon discovered that the family's legal documents, including passports and birth certificates, were missing, as were the children's toys. At that time, Nathan became concerned because his wife had been exhibiting "unusual behavior" during the previous two weeks and, although there had been no recent discussion of a trip, he suspected that his wife had run away with the children. In the preceding days, Heidi had not been sleeping well and had accused Nathan repeatedly of committing adultery, which at the time he thought was "normal marital friction." On further investigation, Nathan discovered email messages containing receipts for airline tickets to San Francisco, where Heidi's brother lives. Nathan contacted Heidi's brother in San Francisco and asked him to meet her at the airport and help her care for the children.

Nathan was eventually able to make contact by email with Heidi, although she was unwilling to talk to him on the phone. During these conversations, Nathan learned that Heidi was concerned that he had developed a brain tumor and Heidi feared that violence would befall the children and herself at Nathan's hands. However, Nathan has never threatened Heidi or the children, nor has there ever been any domestic violence in the family. Nathan's general practitioner has never recommended that he be psychologically evaluated, nor has Nathan ever experienced an episode that he would characterize as "manic," "bipolar," or "clinically depressed."

Case 1:12-cv-00750-WTL-TAB   Document 15   Filed 06/29/12   Page 4 of 13 PageID #: 37

Soon thereafter, Nathan contacted Heidi's sister Brianna and asked her to travel to California to assess the situation, look after the children, and convince Heidi to submit to a psychiatric evaluation. Heidi later permitted Brianna to accompany her and the children on a road trip across Southern California.

On April 7, Nathan arrived at Heidi's mother's house while Heidi was en route to her mother's house. Nathan then met with Heidi on April 9 and asked her to return the children to Switzerland, but Heidi indicated that she was not willing to do so. During the conversation, Nathan observed that Heidi, who appeared to have lost about twenty pounds, looked off into the distance and would then return to the conversation with "new ideas." The couple's discussion focused primarily on the health of each spouse, and Nathan and Heidi eventually decided that the best course of action would be to seek psychiatric evaluation and care together in Southern California.

Nathan and Heidi met with a doctor at the University of California-Irvine on April 11. The doctor suggested that Heidi may be suffering from an unknown psychological problem and recommended that Heidi be admitted for a 72-hour inpatient evaluation. Nathan observed that Heidi became "highly agitated" at this suggestion, and she then left the appointment, explaining that she was "going to go outside and lay in the sun." Nathan followed Heidi into the parking lot, where a "tense" discussion ensued as Heidi demanded that Nathan go to the emergency room. Nathan believe that Heidi was not safe to drive in her agitated state, and he prevented her from fleeing in the couple's automobile by holding the key in the ignition so that Heidi was unable to turn the key and start the vehicle. Heidi then fled the automobile, and Nathan took the keys.

Following the incident outside the doctor's office, Nathan returned to Heidi's mother's

home and, with Heidi's mother's approval, took the children to his brother's home in Carmel, Indiana, where the children still are today. Although Heidi was still partially nursing her son when Nathan took him, Nathan reports that his son is healthy and gaining weight despite no longer nursing. The children currently communicate daily with their mother by video chat, and Nathan himself receives approximately ten text messages and five emails per day from Heidi.

After relocating the children to Indiana, Nathan traveled to Switzerland, where he filed for legal separation and also filed a Hague petition with the Central Authority. While in Switzerland, Nathan underwent an MRI according to his agreement with Heidi that they both would seek medical evaluation. The MRI results were normal. Prior to his trip to Switzerland Nathan worried that his trip might cause difficulties regarding custody of the children, so Nathan sought Heidi's consent to transfer temporary guardianship of the children to Nathan's brother, but Heidi refused. Nathan has since returned to the United States, where he rents an apartment for himself and his two children while waiting for this matter to be resolved.

Heidi filed a petition for separation on April 13, 2012, which was later dismissed at her request. According to counsel, Heidi has since filed a Hague petition in the California courts.

Nathan asks this Court to issue an order giving Nathan sole temporary custody of the children for the purpose of returning the children to Switzerland. In addition, Nathan requests the Court issue an order facilitating the return or regeneration of the children's passports, which he has been unable to find. Heidi opposes the petition on the ground that return of the children to Switzerland would put them at grave risk of psychological and physical harm. The Court addresses the parties' arguments below.

## III. DISCUSSION

### A. Case for Return of the Children

A petitioner seeking return of children must show by a preponderance of the evidence that (1) a child under sixteen years of age was (2) wrongfully removed (3) from his or her habitual residence. There can be no dispute as to the first element of Nathan's case: the Luedtke children are well under the age of sixteen. Because whether the removal is wrongful depends on the habitual residence of the child, the Court turns to analysis of that element next.

Courts should interpret "habitual residence" according to the "ordinary and natural meaning of the two words it contains, as a question of fact to be decided by reference to all the circumstances of any particular case." *Koch*, 450 F.3d at 712 (citations omitted) (describing the habitual residence test articulated in *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001), and adopting its approach). With respect to young children, the intent of the child's parents rather than the intent of the child is most useful in determining the child's habitual residence. *Koch*, 450 F.3d at 713. In determining the parents' intent, the court considers whether the parents' primary "residence was effectively abandoned and a new residence established by the shared actions and intent of the parents coupled with the passage of time." *Id.* at 715. In doing so, the court may consider actions as well as declarations. *Id.*

Here, the evidence clearly establishes that the Luedtkes intended to abandon the United States and make Switzerland their habitual residence. As a preliminary point, the record reveals that the Luedtke family has lived in Switzerland for the past six years. *See id.* at 713 (quoting *Mozes*, 239 F.3d at 1075-76) ("If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any

prior habitual residence."). While sheer length of stay is not dispositive, *see Koch*, 450 F.3d at 715 (citing *Mozes*, 239 F.3d at 1078) ("The establishment of a habitual residence requires an actual change in geography, as well as the passage of an appreciable amount of time."), other evidence indicates that the Luedtkes have abandoned residence in the United States and established residence in Switzerland. Nathan was recently awarded tenure status as a professor of organic chemistry at the University of Zurich. He testified that Zurich was an ideal environment to raise children and an ideal work environment and explained he has no intent to leave Switzerland at any time in the future.[1] In addition, Nathan has recently filed for separation in the Swiss courts, and he intends to fully abide by the Swiss court's determination of separation and child custody. Because Heidi did not testify at the hearing, it is more difficult to discern her intent. However, the Court finds that her decision to seek a larger flat, which required committing to a one-year lease, to accommodate the Luedtkes' growing family speaks to her intent to make her home in Switzerland. For these reasons, the Court concludes that the Luedtkes abandoned any residence they had in the United States and, at the time Heidi brought the children to the United States, their habitual residence was Switzerland.

The final step in the inquiry is whether the removal of the children from Switzerland is wrongful. Removal is wrongful when (a) it is in breach of rights of custody attributed to a

---

[1] Counsel for Heidi argued that Nathan has effectively abandoned his residence in Switzerland. This argument borders on the ridiculous. Nathan clearly testified that he had no plans to travel to the United States, let alone remain here; rather, the sole reason that Nathan is present in the United States today is because his wife fled their country of residence with his young children in tow. Indeed, Nathan recently composed and sent a chemistry examination to be administered to his students at the University of Zurich, and he has twice returned to Switzerland during the pendency of this dispute to attend to "critical business." There is not even a shred of evidence here to suggest that Nathan intends to abandon his residence in Switzerland.

person, either jointly or alone, under the law of the country in which the child was habitually resident immediately before the removal; and (b) at the time of removal those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal. *E.g., Koch*, 450 F. 3d at 712. "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *E.g., Abbott v. Abbott*, 130 S. Ct. 1983, 1988 (2010) (quoting Article 5 of the Hague Convention); 42 U.S.C. § 11601(b)(2)("The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention.").

This analysis requires inquiry into Swiss law regarding parental custody rights. Accordingly, the Court takes judicial notice of the following: Pursuant to Article 297, paragraph 1 of the Swiss Civil Code, parents exercise custody jointly during marriage. Furthermore, pursuant to paragraph two of the same Article, if the parents cease living together or they are separated, the court may award parental custody to one spouse. There is no evidence to suggest that, at the time Heidi removed the children from Switzerland, any court order existed as to custody of the Luedtke children.[2] For this reason, the Court concludes that Nathan and Heidi had joint parental custody under Swiss law at the time the children were removed. Thus, when Heidi took the children to another country, she effectively precluded Nathan from caring for the children or having any say in where the children would reside. The removal of the children from Switzerland thus breached Nathan's custody rights and constitutes wrongful removal.

Finally, the Court must determine whether Nathan was actually exercising his custody

---

[2] In fact, as of May 22, 2012, the Swiss court wherein the Luedtkes' petition for separation is pending has held that parental custody temporarily remains with both parties as a precautionary measure for the duration of the action.

rights before Heidi took the children to the United States. Whether rights were "actually exercised" is a highly fact specific inquiry, but it is not a high bar. *Friedrich v. Friedrich*, 78 F.3d 1060, 1065-66 (6th Cir. 1996) (construing the phrase "liberally" and requiring evidence of "clear and unequivocal abandonment of the child"). "Exercise" is found whenever "a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.* The Court has little trouble concluding that Nathan was actually exercising his custody rights, given his testimony that he participated in caring for the children on evenings and weekends.

For the foregoing reasons, Nathan has established the elements of his case for the return of his children to Switzerland.

## B. Heidi's "Grave Risk" Defense

Heidi argues that the children should not be returned to Switzerland because doing so poses a grave risk of psychological harm to the children. A court may refuse to order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention Art. 13(b), Nov. 24, 1980, 19 I.L.M. 1501 (1980); 42 U.S.C. § 11603(e)(2)(A) (incorporating by reference Article 13(b) of the Convention). The party opposing the return must prove that there is a grave risk by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). This is a "demanding standard" and the "risk of harm must truly be grave." *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011) (citing *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)).

While Heidi argues that Nathan poses a risk of harm to the children, she offers little

evidence supporting her allegations.[3] In fact, the only evidence Heidi points to is the fact that the Swiss Court wherein the petition for separation is pending has requested psychological evaluations of *both* parents. But this "evidence" sheds little light, if any, on whether Nathan poses a risk of grave harm to the children; especially given that, in the meantime, the Swiss Court has ordered that custody remains with both parties. As such, Heidi falls far short of establishing a risk of harm by clear and convincing evidence. Instead, Heidi urges that the Seventh Circuit's view of the Hague Convention articulated in *Khan v. Fatima* should guide this Court's analysis. 680 F.3d 781 (7th Cir. 2012). In *Khan*, Judge Posner explained that the return of children may not be appropriate when "the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Id.* at 784. However, the actual holding in *Khan* is a procedural one, as the Court remanded the case for rehearing due to the district court's failure to make findings of fact. *Id.* at 788. To the extent that *Khan* can be read to say anything substantive about analyzing the "grave risk" defense, *Khan* is clearly distinguishable from this case, as it involved overwhelming evidence of domestic violence. *See id.* at 790 (Hamilton, J., dissenting) ("Despite my colleagues' disclaimers that the reversal is only a procedural decision, though, the reversal does what Hague Convention courts are not supposed to do. The reversal is also clearly based on the view that the district judge who saw and heard the witnesses was simply wrong in his evaluation of the parties' credibility–an evaluation we can make only by reading and re-reading transcripts."). In that case, the district court ordered the

---

[3] The Court notes that Heidi alleges that Nathan threatened to kill her and the children and that she fears for their safety. Resp.'s Mot. to Allow Tel. Test. ¶ 3, June 26, 2012, ECF No. 12. However, allegations are not evidence. *See Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006) ("mere allegations of a complaint are not evidence").

children returned after an entire day of testimony about the left-behind father's abuse of the "abductor"-mother, including testimony from the mother, the mother's sister, her sister's husband, and the child's visitation supervisors. The mother's testimony revealed that "she'd been beaten with a pillow . . . , knocked down by [the child's father] in front of [the child], hit in the chest by a heavy wallet that he had hurled at her, choked by him twice (and she said she thought she would die) when she was pregnant with her second child, threatened . . . with having her eyeballs yanked out, and dragged bodily from the backyard into a room in the house." *Id.* at 786. In addition, photographs and a police report were offered as evidence of the father's abuse. On the contrary, in this case, the Court has been presented with no evidence at all to support Heidi's allegations. In fact, Nathan testified that there have been no incidents of domestic violence and he has never threatened Heidi or the children. While the concerns of the Court in *Khan* are certainly valid, there is no evidence that they are at issue here.

Nonetheless, the Court does agree that it should be guided by the purposes of the Hague Convention as set forth in *Khan*: "to discourage abductions by parents who either lost, or would lose, a custody contest . . . , reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed." *Id.* at 784-85. As further explained by Judge Hamilton in dissent, the Convention delegates believed that the "courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions and allowing their use only in clearly meritorious cases, and only when the person opposing return had met the burden of proof." *Id.* (citing Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg.10,494, 10,509 (March 26, 1986)); *see also Norinder*, 657 F.3d at 535 ("any more lenient standard [for the grave risk defense] would create

a situation where the exception would swallow the rule"). As Heidi has presented no evidence at all that the Luedtke children would be in danger if returned to Switzerland in Nathan's care, ordering the return of the children to Switzerland best serves the Convention's purposes by not rewarding her abduction of the children and locating the custody contest in the appropriate forum.[4]

Finally, Heidi requests that this Court stay its order pending a psychological evaluation of Nathan. In support of her argument, she again points the Court to *Khan*, wherein the Seventh Circuit strongly suggested that on remand the judge should appoint a child psychologist to interview the abducted child. Yet the gross differences between these two cases bears repeating: unlike the mother in *Khan*, Heidi has not offered any evidence to support her allegations that Nathan is a danger to her or the children. Thus, there is no reason for this Court to order a psychological evaluation, much less delay returning the children to the only home they have ever known.[5]

For these reasons, the Court finds that returning the children to Switzerland will not pose a grave risk of psychological harm to the children.

---

[4] The Court is cognizant of the fact that Heidi is, however, the Luedtke children's primary caretaker.

[5] Moreover, ordering a psychological evaluation here could only open Pandora's box; the Court foresees requests for second opinions and psychological evaluations of Heidi as well; events that would render this dispute a full-blown custody fight, a result this Court is statutorily required to avoid. *Khan*, 680 F.3d at 798 (Hamilton, J., dissenting) ("In other words, the judge recognized, he would be hearing a full-blown custody fight, which simply was not his job under the Hague Convention.").

## IV. CONCLUSION

"When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott,* 130 S. Ct. 1983, at 1989 (citing Article 12 of the Hague Convention). No exceptions apply here. Accordingly, Nathan Luedtke's Petition for Return of Children is **GRANTED** to the extent set forth below:

1. Petitioner is hereby **GRANTED** temporary sole custody of the children for the sole purpose of returning the children to Switzerland.

2. The Respondent is hereby **ORDERED** to cooperate in securing the necessary passports and travel paperwork to facilitate the children's return to Switzerland within seven days of the date of this entry.

3. Petitioner's request for attorney's fees and costs is hereby **TAKEN UNDER ADVISEMENT** pending submission of supporting documentation.

**SO ORDERED:**    06/29/2012

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.